## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

FRANK G. ROSENSKI, Derivatively On Behalf of
SYMBOL TECHNOLOGIES, INC.,

                 Plaintiff,

vs.

WILLIAM R. NUTI, SALVATORE IANNUZZI,
MARK T. GREENQUIST, ROBERT J. CHRENC,
GEORGE SAMENUK, MELVIN A. YELLIN,
EDWARD KOZEL, and J. MICHAEL LAWRIE,

                 Defendants,

-and-

SYMBOL TECHNOLOGIES, INC., a Delaware
corporation,

                 Nominal Defendant.

: Case No.:
:
: VERIFIED SHAREHOLDER
: DERIVATIVE COMPLAINT
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

FILED
U.S. IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y

FEB 15 2006

HURLEY, J.

WALL M.J

### BASIS OF ALLEGATIONS

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which

included a review of United States Securities and Exchange Commission ("SEC") filings by

Symbol Technologies, Inc. ("Symbol," or the "Company"), as well as regulatory filings and

reports, press releases and other public statements issued by the Company, and media reports

about the Company. Plaintiff believes that substantial additional evidentiary support will exist

for the allegations set forth herein after a reasonable opportunity for discovery.

### INTRODUCTION AND OVERVIEW

1.     This is a verified stockholder's derivative action brought on behalf of Symbol by

one of its shareholders against Symbol's board of directors for breaching their fiduciary duties

during the period May 2004 to present (the "Relevant Period") by: (1) allowing and engaging in

a scheme to artificially inflate the price of Symbol securities by causing Symbol to issue

materially false and misleading statements regarding the Company's business and prospects; (2) causing Symbol to issue a materially false and misleading proxy in violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated thereunder; (3) allowing Company insiders, including members of the board of directors, to reap significant profits from transacting in Symbol securities while in possession of material non-public information about the Company; (4) failing to properly oversee or implement adequate procedures to detect and prevent such wrongdoing; and (5) exposing the Company to shareholder suits for alleged violations of the federal securities laws.

2.　　Symbol is a Holtsville, New York-based designer and manufacturer of enterprise mobility solutions, including scanners, payment systems and wireless infrastructure.

3.　　In 2003, Symbol was embroiled in a headline-grabbing securities/accounting fraud scandal that resulted in a restatement of its financial results for the period 1998 to 2003, the initiation of investigations by the SEC and a U.S. Attorney's Office, and the filing of private securities class actions. In or about June 2004, the Company announced that it had settled the investigations and the class actions by paying $37 million in fines to the SEC, the execution of a non-prosecution agreement with the U.S. Attorney's Office, and the payment of $98 million to Symbol shareholders.

4.　　At the beginning of the Relevant Period, defendants sought to distance themselves from the Company's tainted past and to win back the trust of investors. During this period, defendants represented that the Company had completed an overhaul of its internal control systems and processes to prevent a recurrence of its accounting problems. In a press release announcing the regulatory and class action settlements, defendant William Nuti, Symbol's President and Chief Executive Officer during the Relevant Period, stated, that, *"During the past*

2

*two years, we have executed a remarkable change management program in an effort to dramatically improve our corporate culture, organizational structure, operational excellence and financial performance . . .* and have taken this opportunity to put in place a *dramatically improved corporate governance infrastructure.*" (emphasis added) In truth, however, defendants had not revamped the Company, and the Company's internal controls remained wholly inadequate and caused the Company to continue to report financial results and issue guidance that was materially false and misleading.

5. On November 8, 2004, defendants' scheme began to unravel. On that day, Symbol announced that it would delay filing its quarterly report for the third quarter of 2004 with the SEC after an internal investigation revealed that the Company had improperly recognized revenue in the first and/or second quarter(s) of 2004. Defendant Nuti revealed that *"we discovered certain discrepancies in the amount of inventory at a distributor as well as inventory on hand that affected our previously announced results."* (emphasis added) In reaction to this announcement, the price of Symbol common stock fell $1.08 per share, or 7.1%, in one day, from its closing price of $15.17 from the previous trading day, November 5, 2004, to close at $14.11 per share on November 8, 2004, on unusually heavy trading volume of over 7 million shares.

6. Then, on May 3, 2005, after the close of ordinary trading, Symbol announced disappointing results for the first quarter of 2005, falling short of the revenues and earnings guidance issued only two months before. In response to this announcement, the price of Symbol technology dropped by $2.01 per share, or 15.5%, from its closing price of $12.97 on May 3, 2005 to $10.97 per share on May 4, 2005, on unusually heavy trading volume.

3

7. On June 27, 2005, the Company filed amended reports with the SEC for the first, second, and third quarters of 2004 and for fiscal years 2002 and 2003 to, in part, correct disclosures concerning the adequacy of the Company's controls and procedures contained therein. For example, in the Company's amended quarterly report for the third quarter of 2004, filed on a Form 10-Q/A, the Company identified material weakness related to the processing of transactions to record revenue, as well as "inadequate systems and systems interfaces; inadequate and untimely account reconciliations; numerous manual journal entries; and informal worldwide policies and procedures."

8. On June 28, 2005, the Company announced that it was taking a restructuring charge in the range of $75 million to $95 million and that, as a result, it was slashing its earnings guidance in half for the second quarter of 2005. In reaction to this news, Symbol shares fell another $0.75 per share, or 7%, from its closing price on June 28, 2005, to close at $9.71 on June 29, 2005.

9. On July 14, 2005, Symbol announced that defendant Mark T. Greenquist, the Company's Chief Financial Officer, left the Company to pursue other interests. In a press release, defendant Salvatore Iannuzzi, Greenquist's successor, admitted that the Company's internal controls were lacking such that the Company was unable to provide reliable and realistic financial guidance to the market. As a result, the Company slashed its earnings guidance for the second time in one month.

10. On August 1, 2005, before the market opened, the Company announced disappointing second quarter results that were well below the revised guidance provided in July 2005. The Company reported second quarter revenue 1.2% lower than a year earlier and a loss of $30 million, compared to a $29 million profit in the same period in 2004. In addition, the

4

Company announced that defendant Ianuzzi had resigned his position as CEO. In reaction to this news, the price of Symbol's stock fell $1.79 per share, or 15%, from its closing price of $11.63 on its previous trading day on July 29, 2005, to close at $9.84 on August 1, 2005.

11. As alleged herein, defendants violated Section 14(a) of the Exchange Act by issuing, or allowing to be issued, a materially false and misleading proxy statement. In addition, as further alleged herein, defendants breached their fiduciary duties to the Company and its shareholders. As directors, the Director Defendants were charged with safeguarding the Company's best interests. By November 8, 2004, it was apparent that the Director Defendants, contrary to their representations, had failed to overhaul the Company's internal accounting and other controls and procedures that ultimately forced the Company to incur a $80 million charge and be exposed to securities class actions brought on behalf of aggrieved shareholders who were damaged when the price of the stock plummeted as the scheme came to light.

## JURISDICTION AND VENUE

12. This action asserts derivative claims pursuant to Federal Rule of Civil Procedure 23.1 on behalf of Symbol pursuant to Sections 14(a) of the Exchange Act, 15 U.S.C. §78n(a) and principles of common law. The Court has federal question jurisdiction over the federal claims asserted in this action pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

13. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

14. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Symbol, the nominal defendant, is headquartered within this District and because many of the acts alleged and complained of occurred in this District.

## THE PARTIES

15. Plaintiff Frank G. Rosenski is, and was at times relevant hereto, an owner and holder of Symbol common stock. Plaintiff is a citizen of Pennsylvania.

16. Nominal defendant Symbol is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at One Symbol Plaza, Holtsville, New York 11742. Symbol designs, develops, manufactures and services products and systems used in end-to-end enterprise mobility solutions. Symbol's products and solutions capture, move and manage information in real time to assist customers in making more efficient business decisions. Company products include advanced data capture products, mobile computing platforms, wireless infrastructure, radio frequency identification infrastructure and tags and mobility software and services, and are sold as both integrated solutions and individual devices.

17. Defendant William R. Nuti ("Nuti") was President, Chief Executive Officer ("CEO") and a director of Symbol at all times relevant hereto, until his resignation on August 1, 2005. In fiscal year 2004, Symbol paid defendant Nuti $2,212,407 in salary, bonus and other compensation, and granted him 200,000 options to purchase Symbol stock. During the Relevant Period, Nuti sold 400,000 shares of Symbol stock for proceeds of $6,580,000. Nuti is a citizen of New York.

18. Defendant Salvatore Iannuzzi ("Iannuzzi") was, at all relevant times, a director of Symbol, and since August 1, 2005, Iannuzzi was interim President and CEO of Symbol. In January 2006, Iannuzzi became President and CEO of the Company. Iannuzzi is a citizen of New York.

6

19.     Defendant Mark T. Greenquist ("Greenquist") was Chief Financial Officer ("CFO") and Senior Vice President of Symbol until July 14, 2005. Greenquist is a citizen of Connecticut.

20.     Defendant Robert J. Chrenc ("Chrenc") was, at all relevant times, a director of Symbol. Chrenc is a citizen of Florida.

21.     Defendant George Samenuk ("Samenuk") was, at all relevant times, a director of Symbol. Samenuk is a citizen of Connecticut.

22.     Defendant Melvin A. Yellin ("Yellin") was, at all relevant times, a director of Symbol. Yellin is a citizen of New York.

23.     Defendant Edward R. Kozel ("Kozel") was, at all times relevant times, a director of Symbol. Kozel is a citizen of California.

24.     Defendant J. Michael Lawrie ("Lawrie") was a director of Symbol since approximately June 16, 2005. Lawrie is a citizen of Connecticut.

25.     The defendants identified in ¶¶17-24 are referred to herein as the "Director Defendants."

2ɔ.     Because of their positions of trust, loyalty and fidelity, the Director Defendants owed the Company and its public shareholders the duty to exercise a high degree of due care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Symbol's directors complained of herein involves a knowing and culpable violation of their obligations as directors of Symbol, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the directors were aware or should have been aware posed

7

a risk of serious injury to the Company. The conduct of Symbol's officers and directors has been ratified by Symbol's Board, which has failed to take any timely action against them.

27.     Regardless of their positions of trust and fidelity, during the relevant period, while in the possession of materially adverse non-public information regarding Symbol, the Director Defendants either sold or acquiesced in and/or permitted the sale of significant amounts of Company stock by the officers, directors and/or insiders of the Company. Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because it allowed certain company insiders to sell Symbol shares while the price of such shares were inflated by defendants' misrepresentations to the market.

28.     The officers and directors of Symbol were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position. The directors of Symbol were required, among other things:

        a.      To, in good faith, manage, conduct, supervise and direct the business and affairs of Symbol carefully and prudently and in accordance with the laws of whichever state controls its "internal affairs," the laws of the United States and the rules and regulations and the charter and by-laws of Symbol;

        b.      To neither violate nor knowingly permit any officer, director or employee of Symbol to violate applicable federal and state laws, rules and regulations or any rule or regulation of Symbol;

        c.      To exercise reasonable control and supervision over the public statements to the securities markets and trading in Symbol stock by the officers and employees of Symbol;

8

d. To remain informed as to the status of Symbol's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the federal securities laws;

e. To supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports or other information required by law, to examine and evaluate any reports or examinations, audits, or other financial information concerning the financial condition of Symbol and to cause Symbol to obey and comply with and not violate the federal or state securities laws;

f. To ensure that Symbol was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations; and

g. To maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Company would make false statements about Symbol to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and profit, by insider stock trading or otherwise.

29. The Director Defendants, as corporate officers and/or directors, owed Symbol and its shareholders the duty of due care in the performance of their responsibilities with respect to Symbol's operations. Each of the Director Defendants in this action, individually or jointly, as alleged herein, failed to exercise reasonable diligence and due care, was grossly negligent or reckless, and committed one or more of the following actions or omissions constituting waste, mismanagement and breaches of fiduciary duty:

9

a. The Director Defendants authorized, caused or permitted Symbol to conduct its business in an unsafe, imprudent and dangerous manner by pursuing unsound practices, including concealing their reckless, unsafe and unsound practices and the serious adverse impact of these practices.

b. The Director Defendants authorized, caused or permitted Symbol to operate and report information in a manner that was contrary to federal regulations, thus exposing it to liability for violation of the federal securities laws; and

c. The Director Defendants' conduct as alleged herein has also damaged Symbol by exposing it to the cost of the defense of and possible cost of liability for violation of the federal securities laws as a result of the securities law class action lawsuits now pending against it in federal court, damage to the goodwill and reputation of Symbol due to the negative adverse publicity.

30. By reason of their corporate positions and their ability to control the business and corporate affairs of Symbol, the Director Defendants owed Symbol and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control Symbol in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Symbol and its stockholders and not in furtherance of their own personal interests. In addition, each director owed Symbol, while he occupied such directorship, the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of Symbol and in the use and preservation of its property and assets. In violation of their fiduciary duties, the Director Defendants permitted and/or caused Symbol to conduct its business in an unsafe, imprudent and dangerous manner by violating the federal securities laws and permitting certain

10

insiders to misappropriate and misuse confidential non-public corporate information for their personal profit.

31. The Director Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves by remaining as officers and/or directors of the corporation, to inflate the price of the Company's common stock and to conceal defendants' wrongful conduct, so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order to enhance the value of their securities holdings and options to purchase Symbol stock. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, approving and acquiescing in the conduct complained of herein.

32. As members of the Board of Directors of Symbol, the directors named herein as defendants were themselves directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices that resulted in the misappropriation of confidential corporate information and violation of the federal securities laws, as alleged herein. Each of them had knowledge of and actively participated in and approved of the wrongdoings alleged or abdicated his responsibilities with respect to these wrongdoings. The alleged acts of wrongdoing subjected Symbol to unreasonable risks without any reward to the Company or its shareholders.

33. By reason of their membership on the Symbol Board of Directors and/or positions as executive officers of the Company, the defendants were each controlling persons of Symbol and had the power and influence to cause, and did cause, the Company to engage in and/or permit the conduct complained of herein.

11

## SUBSTANTIVE ALLEGATIONS

### Materially False And Misleading Statements

34.     During the Relevant Period, the Director Defendants caused Symbol to issue

materially false and misleading statements that were in violation of their fiduciary duties owed to

the Company to insure that the Company's financial reporting fairly presented the operations and

financial condition of the Company. Defendants Kozel, Yellin, Chrenc, Samenuk and Iannuzzi,

as members of the Audit Committee during the Relevant Period, had a special duty to ensure that

statements concerning the Company's financial health were complete and accurate. In addition,

defendants Iannuzzi, Greenquist and Nuti, as officers of Symbol, had ample opportunity to

discuss this material information with fellow officers at management meetings, and with fellow

directors at Board of Directors meetings during the Relevant Period. Despite these duties, the

Director Defendants negligently, recklessly, and/or intentionally caused or allowed, by their

actions or inactions, the following improper statements to be filed with the SEC and to be

disseminated by Symbol to the investing public and the Company's shareholders during the

Relevant Period.

35.     On May 10, 2004, the Director Defendants caused or allowed Symbol to release

its financial and operational results for the first quarter ended March 31, 2004. The press release

stated, in pertinent part, as follows:

Revenue for the first quarter ended March 31, 2004, was $419.7 million,
an increase of 9 percent over first-quarter 2003 revenue of $386.3 million
and an increase of 7 percent over fourth-quarter 2003 revenue of $393.0
million.

First-quarter net earnings were $6.8 million, or $0.03 per share, which
includes a $13.5 million, or $0.05 per share, charge to income taxes for a
portion of a previously recorded deferred tax asset, related to ongoing
negotiations to settle the previously disclosed government investigation,
that may not be realized. Excluding this charge, net earnings were $20.3
million, or $0.08 per share. This compares with a first-quarter 2003 net

12

loss of ($31.0) million, or $(0.13) per share, and fourth-quarter 2003 net earnings of $16.2 million, or $0.07 per share.

Product revenue of $348.2 million reflected continuing and balanced growth in sales for all Symbol product groups - mobile computing, wireless infrastructure and advanced data capture. The increased product revenue - up 11 percent sequentially from fourth quarter 2003's $314.1 million and up 12 percent year over year - was supported by sales of new products such as the MC9000-G, an innovative mobile computer; the LS2200 handheld scanner; and Symbol's industry-leading wireless switching product line.

Service revenue of $71.4 million showed a quarter-to-quarter decline of 10 percent from $78.9 million and a year-over-year decline of 6 percent from $75.6 million. Contributing to the decline is the Company's deliberate strategy to have its channel partners deliver professional services, as well as the impact that the timing of cash receipts has on revenue recognized on a billed-and-collected basis.

First-quarter 2004 gross profit increased 6 percent to $194.9 million compared with fourth-quarter 2003 gross profit of $184.1 million and increased 13 percent from $171.9 million in first quarter 2003.

Defendant Nuti attributed the results to growing acceptance of the Company's new products,

stating, in relevant part, as follows:

William Nuti, Symbol president and chief executive officer, said, "I want to congratulate our associates and channel partners on a strong first-quarter revenue performance. At $419.7 million, first-quarter 2004 revenue came in above the top of our range and set a vigorous pace for 2004. Product revenue growth was a key driver of our success and reflected enthusiasm for some of our newer products as they gain traction in the marketplace. It also underscores our belief that we are gaining market share, and that our enterprise mobility systems strategy wins out over point product offerings from our competitors. While operational expenses exceeded our expectations, there were several one-time charges associated with cleaning up the past. We remain focused on improving the bottom line through better expense controls, increasing productivity and continuing to streamline operations."

36. On May 10, 2004, the Company filed its first quarter 2004 report with the SEC on

a Form 10-Q, reiterating the results contained in the press release issued on the same day. In

addition, the Form 10-Q contained certifications signed by defendants Greenquist and Nuti, as

13

required by Section 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley Act"), stating, in

pertinent part, as follows:

> In connection with the Quarterly Report ... on Form 10-Q for the period ended
> March 31, 2004, as filed with the Securities and Exchange Commission on the
> date hereof, [the CEO and CFO] of the Company, certify, pursuant to 18 U.S.C.
> Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of
> 2002, that to [their] knowledge:
>
> The Report fully complies with the requirements of Section 13(a) or 15(d), as
> applicable, of the Securities Exchange Act of 1934, as amended; and
>
> The information contained in the Report fairly presents, in all material respects,
> the financial condition and results of operations of the Company.

     37.     On June 3, 2004, Symbol announced the resolution of the U.S Attorney and SEC

investigations into the Company's falsification of financial reports during the period 1998 to

2003, and settlement of the private securities class actions stemming from the same events. In a

press release, defendants summarized the settlements, highlighting the purported steps the

Company took to strengthen its internal controls, reporting functions, and other initiatives, to

"ensure a corporate culture that emphasizes integrity, honesty and accurate financial reporting."

Defendants stated, in relevant part, as follows:

> Symbol Technologies, Inc. (NYSE:SBL) today announced that it has
> resolved the investigation by the United States Attorney's Office for
> the Eastern District of New York (U.S. Attorney's Office) by executing
> a non-prosecution agreement with the U.S. Attorney's Office, and has
> reached an agreement with the Securities and Exchange Commission (SEC)
> regarding the settlement of allegations against Symbol that have been
> under investigation since May 2001. As a result, no criminal complaint
> will be filed against the Company.
>
> The agreements with the U.S. Attorney's Office and SEC call for
> Symbol to pay $37 million in cash to a restitution fund for members of
> the class consisting of purchasers or acquirers of Symbol stock from
> February 15, 2000, to October 17, 2002, and $3 million to the U.S.
> Postal Inspection Service Consumer Fraud Fund. Also, as part of its
> settlement of private shareholder litigation, brought separately
> against the Company by this class, which is subject to court approval,
> Symbol will pay an additional $98 million, composed of $1.75 million

in cash and $96.25 million in stock, to the class. Under that
agreement, Symbol may elect to pay an additional $6 million in cash
and reduce the amount of stock it pays by the same amount.

\* \* \*

"Symbol has worked tirelessly during the past two years to resolve
problems created by the Company's former management," William Nuti,
Symbol president and chief executive officer, said. *"During the past
two years, we have executed a remarkable change management program in
an effort to dramatically improve our corporate culture,
organizational structure, operational excellence and financial
performance.*

Today we are pleased to announce that we settled the grand jury
and SEC investigations, as well as the preponderance of class action
litigation against us. *We have now succeeded in putting the vast
majority of our problems behind us and have taken this opportunity to
put in place a dramatically improved corporate governance
infrastructure.* Even as we worked through these challenges, we've
remained focused on our business, our customers and partners, as well
as our Company's future. With an improving balance sheet and new
products gaining traction in the marketplace, we are extremely
enthusiastic about the future of the Company and believe Symbol is
strongly positioned to lead in the new age of enterprise mobility.
Today is a very good day for the new Symbol Technologies - The
Enterprise Mobility Company."

\* \* \*

*The Company has implemented various initiatives intended to
materially improve its internal controls and procedures, address the
systems and personnel issues raised in the course of the restatement
and help ensure a corporate culture that emphasizes integrity, honesty
and accurate financial reporting.* These initiatives address Symbol's
control environment, organization, staffing, policies, procedures,
documentation and information systems. [Emphasis added].

38.     On July 29, 2004, Symbol announced record revenues for the second quarter of

2004, reporting the following results in a press release:

Revenue for the second quarter ended June 30, 2004, was $432.8 million,
representing the Company's highest quarterly revenue in its history as well
as a gain of 16 percent over second-quarter 2003 revenue of $373.8
million and an increase of 3 percent over first-quarter 2004 revenue of

15

$419.7 million.

Second-quarter 2004 net earnings were $28.8 million, or $0.12 per share, compared with second-quarter 2003 net earnings of $6.6 million, or $0.03 per share, and first-quarter 2004 net earnings of $6.8 million, or $0.03 per share.

New Products Lead Revenue Gain

Product revenue of $356.6 million represents a 23 percent increase over product revenue of $290.3 million in 2003's second quarter and a 2 percent gain sequentially from 2004's first-quarter product revenue of $348.2 million. Product revenue growth was led by gains from the Company's Mobile Computing and Wireless Infrastructure Divisions. Advanced Data Capture Division revenue increased 27 percent over 2003's second-quarter revenue but declined sequentially following the division's booking of record revenue in 2004's first quarter.

Defendant Nuti commented on the favorable results noting, in reference to the previous accounting scandals, that the Company had "put the vast majority of our past issues behind us":

"On balance, this was an impressive quarter for Symbol Technologies. During the quarter, we put the vast majority of our past issues behind us - settling with the SEC, with a former chairman/CEO and with the United States Attorney's office, which agreed not to file criminal charges against the Company, as well as the tentative settlement with the Symbol class action plaintiffs. During the same time, we drove record results, achieving revenue of $432.8 million, EPS of $0.12 and double-digit operating margins, all of which exceeded our May guidance. These successes are a credit to the hard work and determination of Symbol employees and our channel partners - delivering outstanding service, products and enterprise mobility system solutions to our customers. New products within our enterprise mobility strategy continued to drive accelerated revenue, reinforcing our belief that Symbol market share gains are ongoing. Although operating expense discipline is progressing, we remain committed to further improving the bottom line by focusing on employee productivity and operational efficiencies, "William Nuti, Symbol president and chief executive officer, said. [Emphasis added.]

39.    On July 30, 2004, the Company filed its second quarter 2004 results with the SEC on a Form 10-Q. The Form 10-Q reiterated the results announced in the July 29, 2004 press release and contained certifications signed by Greenquist and Nuti, pursuant to Section 906 of Sarbanes Oxley Act that were substantially similar to the certifications set forth in paragraph 36.

16

40. On September 9, 2004, the Company announced that it had completed the

acquisition of Matrics, Inc. for $230 million. According to the press release, "Symbol financed

this acquisition with short-term borrowings under a new senior, unsecured bank credit facility

and expects to refinance the borrowings in a capital markets equity or equity-linked transaction

later this year, market conditions permitting."

41. On October 26, 2004, Symbol issued a press release announcing results for the

third quarter of 2004, highlighting "record revenue of $442.7 million":

> Revenue for the third quarter ended September 30, 2004, was $442.7
> million, representing the Company's highest quarterly revenue in its
> history as well as a gain of 17 percent over third-quarter 2003 revenue of
> $377.1 million and an increase of just over 2 percent compared to second-
> quarter 2004 revenue of $432.8 million.
>
> Third-quarter 2004 net earnings were $21.1 million, or $0.09 per share,
> compared with third-quarter 2003 net earnings of $11.5 million, or $0.05
> per share, and second-quarter 2004 net earnings of $28.8 million, or $0.12
> per share.

Defendant Greenquist stated as follows regarding the record results:

> Mark T. Greenquist, Symbol senior vice president and chief financial
> officer, said, "In the third quarter, we again were encouraged by our
> earnings performance as well as the continued strong positive cash flow
> from operations. Cash balances of over $230 million, an increase of
> almost $90 million vs. the prior quarter, exceeded our expectations."

42. On November 8, 2004, Symbol announced that it would delay filing its quarterly

report for the third quarter of 2004 with the SEC after an internal investigation revealed that the

Company improperly recognized revenue in one or both of the prior 2004 quarters. Defendants

stated the following regarding the matter:

> Symbol Technologies, Inc., The Enterprise Mobility Company™, today announced a
> two-week delay in filing with the Securities and Exchange Commission the Company's
> quarterly report on Form 10-Q for the quarter ended September 30, 2004, which was due
> to be filed by November 9, 2004. The Company also believes that it may be required to
> amend one or both of its previously filed reports for 2004.

*"As part of our regular control procedures, we discovered certain discrepancies in the amount of inventory at a distributor as well as inventory on hand that affected our previously announced results.* As such, we are delaying our third-quarter filing with the SEC for approximately two weeks," said William Nuti, Symbol president and chief executive officer. "We've moved swiftly to ascertain the nature and extent of these discrepancies. We are in the process of determining whether any amendment to our previously filed SEC quarterly reports is necessary. Symbol is committed to ensuring that its financial statements are accurate and can be relied upon by our shareholders."

Nature of Discrepancies

During Symbol's regular physical inventory control testing, two independent errors were discovered. These errors were the result of two discrete events.

*One event had to do with inaccurate inventory levels reported to Symbol by a large distribution partner. The underreported inventory levels resulted in Symbol inaccurately recording approximately $3.3 million in sales in the third quarter.* This was an oversight on the part of the distributor, which made Symbol aware of the reporting error as soon as it was discovered. This error occurred only in the third quarter of 2004, and no previous quarter was affected.

*The other discrepancy was the result of errors that occurred at a Symbol-owned distribution facility that serves one of its large retail customers. The distribution center relies on its own internal reporting system, and misreported quarter-end inventory levels that resulted in inaccurate sales reporting. Consequently, revenue for the nine months ended September 30, 2004, was overstated by approximately $10 million.* Symbol believes that the large majority of this overstated revenue relates to third quarter 2004, with the remaining balance in prior quarters. [Emphasis added.]

43.     In reaction to this announcement, the price of Symbol common stock fell $1.08

per share, or 7.1%, in one day, from its closing price of $15.17 from the previous trading day,

November 5, 2004, to close at $14.11 per share on November 8, 2004, on unusually heavy

trading volume of over 7 million shares.

44.     On November 15, 2004, the Company belatedly filed its third quarter report with

the SEC on a Form 10-Q. The Form 10-Q reiterated the results announced in the October 26,

2004 press release. In addition, the Form 10-Q contained certifications signed by Greenquist and

Nuti, pursuant to Section 906 of the Sarbanes Oxley Act that was substantially similar to the

certifications set forth in paragraph 36.

18

45. On December 29, 2004, Symbol announced that it had entered into "a new $250

million credit facility, which will replace its proposed stock offering, and act as the permanent

financing vehicle for the Company's acquisition of Matrics, Inc. Additionally, the new credit

facility will provide Symbol with a source of ongoing liquidity."

46. On March 1, 2005, Symbol announced its results for the fourth quarter and full

year 2004, noting that it achieved "record" fourth quarter revenues:

> Revenue for the fourth quarter ended December 31, 2004, was a record
> $450.5 million, slightly exceeding the Company's guidance of $445
> million to $450 million. Fourth-quarter revenue represented a 15 percent
> increase compared to the $393 million in revenue reported in the
> corresponding year-earlier period. Gross margin, at 48.1 percent, was
> above 45 percent for the fifth sequential quarter. Fourth-quarter net
> earnings were $28.5 million, or $0.11 diluted earnings per share,
> compared to $16.2 million, or $0.07 diluted earnings per share, in the
> corresponding year-earlier period.
>
> Revenue for the year ended December 31, 2004, was $1.73 billion,
> compared to $1.53 billion for the year ended December 31, 2003. Net
> earnings for the year ended December 31, 2004, were $81.8 million, or
> $0.33 diluted earnings per share, compared to net earnings of $3.3 million,
> or $0.01 diluted earnings per share, in the prior year.

Commenting on the results, defendant Greenquist highlighted the Company's progress in the

internal control area:

> "Our earnings performance in the fourth quarter was encouraging, and
> we're also very pleased to be able to announce that Symbol will be
> certifying its compliance with the internal control provisions of Sarbanes-
> Oxley 404 -- an outstanding achievement in light of where we were from
> an internal controls perspective two years ago," Mark T. Greenquist,
> senior vice president and chief financial officer, said.

47. In the press release, defendants issued the following guidance for the first quarter

of 2005:

> 2005 First-Quarter Guidance
>
> Based on the strong fourth-quarter 2004 results, the Company expects that
> first-quarter 2005 revenue will be approximately $465 million, up 3

19

percent sequentially and up 11 percent year over year.

Earnings per share for the first quarter of 2005 are expected to be $0.10 to
$0.11. This range does not include the impact, if any, of the Company's
eventual issuing of shares to class action plaintiffs from a settlement
approved in October 2004. The Company currently has accrued $86.6
million relating to this settlement. However, the accounting, under the
terms of this settlement, requires the Company to mark-to-market the
appreciation in the value of shares to be issued above a pre-determined
price in the settlement of $16.41 per share through a non-cash charge to
earnings. The Company believes that for every $1.00 per share in
appreciation of its market value above $16.41, the impact to earnings
would be approximately $3.2 million, or $0.01 per diluted share.

48.     On March 11, 2005, the Company filed its 2004 annual report with the SEC on a

Form 10-K. The Form 10-K reiterated the results announced in the Company's March 1, 2005

press release, and contained certifications signed by defendants Iannuzzi, Chrenc, Kozel, Nuti,

Samenuk and Yellin submitted pursuant to Section 906 of the Sarbanes Oxley Act that were

substantially similar to the certifications set forth in paragraph 36.

49.     On April 11, 2005, the Director Defendants caused Symbol to file a proxy

statement with the SEC (the "Proxy Statement"). The Proxy Statement sought shareholder

approval for reelection of defendants Chrenc, Ianuzzi, Kozel, Nuti, Samenuk, and Yellin.

50.     In the Proxy Statement, the Company represented that it had turned over a new

leaf and adopted effective corporate governance principles and procedures. For example, the

Company stated in its Proxy Statement that it had implemented "Corporate Governance

Guidelines" which the Director Defendants "regularly reviews, and if necessary amends . . . to

ensure their compliance with SEC and NYSE regulations" and that they "meet or exceed the

listing standards adopted by the NYSE." The Corporate Governance Guidelines, incorporated by

reference in the Proxy Statement, described the responsibilities of the Company's Board of

Directors as follows, in relevant part:

**Director Responsibilities**

20

The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Bylaws and committee charters. Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:

a. reviewing and, where appropriate, approving the Company's major financial objectives, plans and actions;

b. reviewing and, where appropriate, approving major changes in, and determinations of other major issues respecting, the appropriate auditing and accounting principles and practices to be used in the preparation of the Company's financial statements;

c. reviewing and, where appropriate, approving major changes in, and determinations under the Company's Guidelines, Code of Conduct and other Company policies;

d. reviewing and, where appropriate, approving actions to be undertaken by the Company that would result in a material change in the financial structure or control of the Company, the acquisition or disposition of any businesses or asset(s) material to the Company or the entry of the Company into any major new line of business;

e. regularly evaluating the performance and approving the compensation of the Chief Executive Officer;

f. with the input of the Chief Executive Officer, regularly evaluating the performance of principal senior executives;

g. planning for succession with respect to the position of Chief Executive Officer and monitoring management's succession planning for other key executives; and

h. ensuring that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.

51. The Proxy Statement also referenced the Company's "Statement of Corporate Policy and Code of Conduct" with which all Company employees, "including the principal executive officer, the principal financial officer and the principal accounting officer and controller, as well as the directors" were required to comply. The Statement of Corporate Policy and Code of Conduct, incorporated by reference in the Proxy Statement, stated, in relevant part, as follows:

21

### I. Introduction and General Statement

It has always been the policy of Symbol Technologies, Inc. and all of its domestic and foreign subsidiaries ("Symbol" or the "Company"), to comply with the law and to conduct its affairs in keeping with the highest moral, legal and ethical standards in every country where it operates. We will conduct our business with integrity, in relation to customers, suppliers, competitors and all others with whom we deal. All associates are required to perform their duties honestly, responsibly and diligently, and in full conformance with this Statement.

The Company has adopted this Statement to reaffirm and clarify its policy in the areas of compliance with laws, political contributions, payments to government officials or others, giving or receiving gifts, company property, proper accounting, dealing with external and internal auditors, conflicts of interest and the use of inside information. This Statement, therefore, is an expression of the Company's views on some of the most significant aspects of business ethics and legal compliance.

### II. Compliance with Laws, Rules and Regulations

The business of the Company shall be conducted in compliance with all applicable laws, rules and regulations.

\* \* \*

52.     The Company also represented in its Statement of Corporate Policy and Code of

Conduct that it had adopted adequate accounting and other controls to ensure the accuracy of

information publicly disseminated by the Company stating, in relevant part, as follows:

### VII. Proper Accounting

It is crucial that all books of account, financial statements and records of the Company reflect the underlying transactions and any disposition of assets in a full, accurate, fair, and timely manner. Our records are the basis of our earnings statements, financial reports and other disclosures to the public and guide our business decision-making and strategic planning.

\* \* \*

### VIII. Accuracy of Financial Reports and Other Public Communications

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition

22

and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These associates must understand and strictly comply with GAAP and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

53.    The Statement of Corporate Policy and Code of Conduct contained the following

prohibition against insider trading:

### XV. Use of Inside Information

"Inside information" is any material financial, technical (including software) or other information which is not known to the public, and which an associate obtains in the course of his or her employment. The use or disclosure of inside information for the purpose of obtaining personal financial gain or which enables any other person or business to attempt to make such gains is strictly forbidden. Company associates are prohibited from trading in the stock or other securities of the Company while in possession of material, nonpublic information about the Company. In addition, Company associates are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell stock or other securities of the Company on the basis of material, nonpublic information.

54.    The Proxy Statement also described the duties of Symbol's Audit Committee as

follows in relevant part:

As more fully described in its charter, the Audit Committee reviews Symbol's financial reporting process on behalf of the Board. Management has the primary responsibility for the financial statements and internal control over financial reporting. Symbol's independent registered public accounting firm, Ernst & Young LLP, are responsible for (1) performing an audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) to obtain reasonable assurance that Symbol's consolidated financial statements are free from material misstatement and for expressing an opinion on the conformity of the financial statements with accounting principles generally

23

accepted in the United States, and (2) performing an audit in
accordance with the standards of the Public Company Accounting
Oversight Board (United States) to obtain reasonable assurance
that management's assessment that Symbol maintained effective
internal control over financial reporting as of December 31, 2004,
is fairly stated, in all material respects and to obtain reasonable
assurance that Symbol maintained effective internal control over
financial reporting as of December 31, 2004, in all material
respects. The internal auditor is responsible to the Audit
Committee and the Board for testing the integrity of the financial
accounting and reporting control systems and such other matters as
the Audit Committee and Board determine from time to time.

55.     The Audit Committee Charter incorporated by reference in the Proxy Statement,

set forth the responsibilities of Symbol's Audit Committee as follows, in relevant part:

> The purpose of the Audit Committee (the "Committee") is to assist
> the Board with its oversight responsibilities regarding: (i) the
> integrity of the Company's financial statements; (ii) the
> Company's compliance with legal and regulatory requirements;
> (iii) the independent auditor's qualifications and independence;
> and (iv) the performance of the Company's internal audit function
> and independent auditor. The Committee shall prepare the report
> required by the rules of the Securities and Exchange Commission
> (the "SEC") to be included in the Company's annual proxy
> statement.

56.     On May 3, 2005, after the close of ordinary trading, Symbol announced

disappointing first quarter 2005 revenue of $457.5 million and earnings per share of $0.09,

which was well below defendants' revenue guidance of $465 million and earnings per share

guidance of $0.10 to $0.11 issued only two months earlier. In relevant part, defendants reported

as follows:

Revenue for the first quarter ended March 31, 2005, was $457.5 million,
representing the Company's highest quarterly revenue in its history as well
as a gain of 9 percent over first-quarter 2004 revenue of $419.7 million
and an increase of 2 percent over fourth-quarter 2004 revenue of $450.5
million.

First-quarter 2005 net earnings were $22.2 million, or $0.09 per share,
compared with first-quarter 2004 net earnings of $6.8 million, or $0.03 per
share, and fourth-quarter 2004 net earnings of $28.5 million, or $0.11 per
share.

24

57.    The Company, however, continued to issue **positive** guidance for the second

quarter and full-year 2005:

Continued Strong Operating and Financial Performance

"The positive trends that we experienced during 2003 and 2004 continued in
2005's first quarter. At $457.5 million, this was a record-revenue quarter for
Symbol, although it was slightly lower than we had expected, as the economy and
information technology spending cooled in Q1," said William R. Nuti, Symbol
president and chief executive officer.

"Going forward, we're planning to adopt a more concerted approach to reducing
total operating expenses, both on an absolute basis and as a percentage of sales.
As we complete our three-year turn-around plan, which we began to implement in
2003, our attentions can now be focused on organizing around growth and
profitability versus a successful turn-around. Net-net, with the turn-around phase
of our strategic plan nearing its end, now is the right time to take the work that has
been substantially completed and turn it into bottom-line leverage for our
shareholders. While we cannot discuss details with you right now, our target is to
lower our operating expense run rate to approximately $170 million by year-end
2005. On our 2005 second-quarter earnings call, likely to be held in early August,
we will provide details on any charges associated with this plan and outline the
anticipated financial impact to our operating margins in 2005," Nuti added.

Mark T. Greenquist, Symbol senior vice president and chief financial officer,
said, "With cash flow from operations of approximately $73 million, 2005's first
quarter represented another solid performance for cash generation. In addition, at
$218 million, our cash balances at March 31, 2005, remained unchanged versus
year-end 2004. That balance excludes the $52 million of restricted cash on the
balance sheet. Also of note, the Company paid down an additional $50 million in
bank debt in the first quarter."

2005 Second-Quarter and Full-Year Guidance

*The Company expects that revenue in second quarter 2005 will be in a range of
$460 million to $470 million, representing growth of 1 percent to 3 percent
sequentially and 6 percent to 9 percent year-over year. With regard to full year
revenue guidance, the Company believes that revenue growth for fiscal year
2005 will likely be at the lower end of its previously disclosed 10 percent to 15
percent range. Second-quarter gross margin is expected to be in the 45 percent
to 46 percent range, and operating expenses are anticipated to be in a range of
$177 million to $180 million.*

*Diluted earnings per share for second quarter 2005 are expected to be $0.05 to
$0.07 per share, reflecting the anticipated impact of a change in New York state
tax law that would result in a second-quarter effective tax rate of approximately*

*50 percent, compared to a normalized effective tax rate of 34 percent*

Without the one-time negative impact, diluted EPS would be $0.07 to $0.09, which would represent second-quarter operating margins of approximately 6.5 percent to 7.5 percent. [Emphasis added.]

58.    *Market Watch* released an article on May 4, 2005 entitled "Symbol Technologies' shares slump on weak outlook" which provided, in pertinent part, the following additional information:

Symbol Technologies' shares as much as 16% on Wednesday after the mobile-computing company reported first-quarter results that failed to meet expectations and gave a weaker-than-anticipated second-quarter outlook.

In afternoon trading, Symbol (SBL: news, chart, profile) gave up $1.93 to fall to $11.05 after earlier touching a 52-week low of $10.92.

The pullback followed the Holtsville, N.Y.-based company's report and outlook, released after Tuesday's close of trading.

Symbol reported a profit than grew to $22.2 million, or 9 cents a share, compared to $6.8 million, or 3 cents, earned in the first quarter a year ago.

Revenue also rose, climbing to $457.5 million from $419.7 million in the year-ago period.

However, Symbol's results fell short of the company's previous estimates calling for a profit between 10 cents and 11 cents a share on revenue of $465 million. Analysts surveyed by Thomson First Call had forecast Symbol would, on average, earn 11 cents a share on $465 million.

"The economy and IT (information technology) spending market were a little weaker," said Mark Greenquist, Symbol's chief financial officer. "Our year-over-year growth trajectory is still going up, but not up as steeply as we thought."

Symbol, which makes bar-code scanners, mobile computers and wireless networking technology, said it sold $384.2 million in products, up 10% from a year ago, while services revenue edged up 3%, hitting $73.2 million.

David Sterman, an analyst with Halpern Capital, said that the last month of the quarter appeared to be especially weak for Symbol, and the company's overall comments suggest more weakness ahead.

"Management concedes that near-term visibility is limited and expects the sales weakness to persist at least through the second-quarter, if not longer," Sterman said in a research note.

26

Offering a look ahead, Symbol expects to post a second-quarter profit of 5 cents to 7 cents a share, on revenue of $460 million to $470 million. Excluding the impact of a change in New York state tax law, Symbol said it should earn between 7 cents and 9 cents a share.

Wall Street analysts' average forecasts had called for Symbol to earn 11 cents a share on $479 million.

59. On May 6, 2005, Symbol filed its first quarter 2005 report with the SEC on a

Form 10-Q. The Form 10-Q reiterated the results announced in the May 3, 2005 press release.

In addition, the Form 10-Q contained certifications signed by Greequist and Nuti, pursuant to

Section 906 of the Sarbanes Oxley Act that were substantially similar to the certifications set

forth in paragraph 36.

60. On June 15, 2005, the Director Defendants caused or allowed Symbol to

announce that it had appointed Elise Kirban as its Chief Ethics and Compliance Officer, effective

immediately. The press release continued, in pertinent part, as follows:

"For the past two years, we have undertaken an enormous change management turnaround program at Symbol, resulting in becoming a leading example of good corporate governance. Elise Kirban's appointment demonstrates our strong and continuing commitment to being a model of good corporate governance with best-in-class ethics and compliance," said Bill Nuti, Symbol president and chief executive officer. *"Adhering to the highest level of integrity and conducting business in the most ethical, honest and open manner is at the core of Symbol's culture*. Elise Kirban is a talented professional with unquestionable integrity. Since she joined the Company, Elise has had a tremendously positive impact on our compliance initiatives and I am proud to have someone of her caliber leading our compliance efforts." [Emphasis added.]

61. On June 27, 2005, the Company filed with the SEC amended quarterly reports for

first, second and third quarter of 2004, and annual reports for fiscal years 2002 and 2003, to, in

part, correct prior disclosures concerning the adequacy of the Company's internal controls and

procedures contained therein. For example, in the Company's amended third quarter 2004

report, filed on a Form 10-Q/A, the Company stated, in relevant part, as follows:

As of December 31, 2003, we identified a material weakness related to the

27

manner in which we process transactions to record our revenue as our current processes and procedures to record revenue transactions requires substantial manual intervention and are reliant on several departments in our sales and finance organization. We also identified certain deficiencies which are summarized as follows:

o    inadequate systems and systems interfaces;

o    inadequate and untimely account reconciliations;

o    numerous manual journal entries; and

o    informal worldwide policies and procedures.

Since the discovery of the material weakness and other deficiencies as described above, during the three-month period ended September 30, 2004, we believe we have finalized several actions undertaken that have improved the effectiveness of our internal controls. These have included the following:

o    centralized the responsibility of revenue under a revenue controller's department, reporting directly to the Chief Accounting Officer;

o    formalized certain worldwide policies and procedures under a worldwide policies and procedures group. To date, the policies and procedures group has issued 79 policies, which have been approved by the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer and are posted on our intranet site, and has 53 waiting executive approval. Included in these policies are our revenue recognition, account reconciliation, and manual journal entry policies;

o    identified responsible associates for account reconciliations, including approvals;

o    implemented formal review processes of transactions where manual intervention still exists; and

o    developed a comprehensive business transformation strategy intended to transform multiple legacy systems into one ERP platform. Beginning in 2003, we have expended approximately $48.5 million thus far and plan to expend an additional $68.5 million through 2006. This investment in software and hardware system upgrades is designed to provide both operational and financial control environment benefits. The financial control environment benefits will include, but are not limited to, reducing the risks associated with multiple system interfaces and improving access controls within and between multiple systems, improving the integration of our sales, finance and accounting departments, improving the accuracy of our revenue reporting, reducing the number of manual transactions and increasing the transparency of financial information.

28

As a result of these and other measures we have taken to date, we believe this material weakness and other deficiencies described above have been remediated.

In November 2004, during our inventory testing (including a planned physical inventory at a company-owned distribution center), two unrelated errors were discovered. These errors were the result of two discrete events. One event involved inaccurate inventory levels reported to us by a large distribution partner. The underreported inventory levels resulted in us inaccurately reporting $3.3 million in revenues in our earnings release on October 26, 2004 for the three and nine-month period ended September 30, 2004. No previous periods were affected. This was an oversight on the part of the distribution partner, which made us aware of the reporting error as soon as it was discovered. The second discrepancy was the result of errors that occurred at a company-owned distribution facility that serves one of our large retail customers. The distribution center relies on its own internal reporting system and misreported inventory. As a result of this second discrepancy, we over reported revenue by $10.3 million for the three and nine month period ended September 30, 2004 in our earnings release on October 26, 2004. Based on these findings, management believes it has significant deficiencies relating to the controls for receiving, shipping and ultimately reporting the amount of inventory. The errors reported as described above led to the delay in filing this report on Form 10-Q as of and for the three and nine month period ended September 30, 2004.

Since the discovery of the significant deficiencies in November 2004 as described above, we have taken the following steps to ensure the financial results as of and for the three and nine month period ended September 30, 2004 as filed in this Form 10-Q are fairly presented in all material respects:

    o    re-performed a physical inventory at this distribution center;

    o    performed a roll back of inventory amounts from the results of our physical counts to each quarter end;

    o    re-performed cut-off procedures at March 31, 2004, June 30, 2004 and September 30, 2004 to determine proper inventory amounts; and

    o    re-confirmed inventory amounts with the distributor.

Additionally, we have taken various measures to improve the effectiveness of our internal controls, including:

    o    placed qualified individuals in the distribution center to manage the movement of inventory within the distribution center; and

    o    developed prospective physical inventory procedures to be performed for the year ending December 31, 2004 and quarterly thereafter at certain of our distributors and our company-owned distribution center to ensure the value of consigned inventory at our distributors and our company-

owned distribution center are accurately recorded.

62.     On June 28, 2005, the Company issued a press release announcing a

"restructuring plan to reduce costs and drive profitability" and that it was lowering its guidance

for the second quarter of 2005 due to purported continued economic sluggishness, particularly in

the global retail market. In the press release, the Company stated, in relevant part, as follows:

> "With the turnaround phase of our transformation plan nearing its end, we need to
> shift resources to efforts focused on growing profitability in 2005 and beyond.
> Over the past several years, we have allocated substantial resources to certain
> functional areas in order to permit Symbol to successfully implement its
> turnaround program. *Now that we are in the next phase of Symbol's evolution,*
> *we must balance our spending on the activities needed to drive profitable*
> *growth, while maintaining strong financial controls and business processes,"*
> *said Bill Nuti, Symbol president and chief executive officer.*
>
> Symbol expects to take a total pre-tax, non-recurring charge in the range of $75 to
> $95 million associated with the cost saving initiatives, of which two-thirds will be
> cash charges and the remaining one-third will be non-cash charges. The Company
> expects to record roughly half of the total pre-tax charges in the second quarter of
> 2005, ending June 30, with the remainder to be incurred in the subsequent two
> quarters.
>
> As part of its restructuring plan, Symbol will be reducing its current worldwide
> workforce, and approximately 700 positions will be impacted by year- end 2005.
> The Company will also consider adding new positions in field sales, product
> development and global services over the next several quarters to drive growth
> opportunities. Other elements of the restructuring plan include the elimination and
> consolidation of certain facilities on a global basis, as well as writing off certain
> other assets.
>
> The restructuring will result in overall quarterly savings of approximately $15
> million, with a rough split of two-thirds of the savings in operating expenses and
> one-third of the savings associated with the cost of sales.
>
> "After careful and deliberate consideration, we decided that restructuring the
> Company, including reducing our workforce and consolidating some facilities,
> was the night choice for Symbol's future. While it is never easy to make such a
> decision, it is vital to ensure Symbol is positioned well for a competitive global
> marketplace. We remain confident in Symbol's future prospects and position as a
> leader in the enterprise mobility segment," Nuti explained.
>
> Second Quarter Earnings Results

Symbol currently expects revenue and earnings in the second quarter 2005 to be below the guidance provided in early May of revenue in the $460 to $470 million range and earnings per share in the $0.07 to $0.09 per share range, excluding a $5 million negative tax impact caused by a state tax law change. The Company now believes second quarter 2005 revenue and earnings will be approximately $440 million and $0.02 to $0.05 per share, excluding the negative tax impact and the restructuring and related charges. For the full year 2005, the Company anticipates revenue growth in the three to six percent range, versus previous guidance of the low end of the 10 to 15 percent range. [Emphasis added.]

63. On June 28, 2005 a *Reuters* article entitled "Symbol Tech to take charge, warns on outlook" provided, in pertinent part, the following additional information:

Symbol Technologies Inc. (SBL.N: Quote, Profile, Research) on Tuesday slashed its earlier revenue and earnings estimates and said it would cut about 700 jobs to cope with weak demand from retailers and Europe.

*Its stock slumped 8 percent in after-hours trade to a two year low, a level unseen since mid-2003 when several former Symbol executives pleaded guilty to criminal charges in the midst of a government accounting probe.*

Despite the heap of bad news, Symbol's Chief Executive Bill Nuti said the two-year turnaround plan at the bar code scanner and handheld computer maker is nearing its end. He cited macroeconomic reasons for the expected shortfalls.

The job cuts represent about 12 percent of the work force, which will be reduced from 5,700 to 5,000. Symbol will take restructuring charges between $75 million and $95 million for items such as headcount reductions and facility consolidation.

Symbol warned that second-quarter earnings and revenue will fall short of its original outlook because retailers around the world are slowing their spending. Symbol also cut its full-year revenue growth forecast given just two months earlier.

"When the retail segment gets a cold, we get a flu," Symbol Chief Executive Bill Nuti told analysts. "We are a company that is highly exposed to retail.""

The restructuring will result in overall quarterly savings of about $ 15 million.

Symbol, based in Holtsville, New York, now expects second-quarter revenue of about $440 million and earnings, excluding a $5 million negative tax impact caused by a state tax law change, of 2 cents to 5 cents a share.

That is down from an early May forecast for revenue of $460 million to $470 million and earnings, excluding the impact of the state tax law change, of 7 cents to 9 cents a share. Analysts had been expecting second-quarter earnings of 6 cents a share on revenue of $465.2 million, according to Reuters Estimates.

For full-year 2005, Symbol now expects revenue growth in a range of 3 percent to 6 percent, well below an earlier forecast for 10 percent to 15 percent growth.

The company said it was considering adding new positions in field sales, product development and global services over the next several quarters to drive growth. "We have very few people in the field covering customers," Nuti said.

Symbol said two-thirds of the restructuring charge will be cash charges and the remaining one-third will be non-cash. It expects to record about half of the total pretax charges in the second quarter ending June 30, with the remainder to be taken in the subsequent two quarters.

Symbol shares traded at $9.60 after hours on the Inet electronic exchange from a close of $10.47 on the New York Stock Exchange on Tuesday.

64.     On July 14, 2005, Symbol issued a press release announcing that defendant

Greenquist had left the Company to pursue other interests. In the press release, defendant

Iannuzzi, Greenquist's successor, admitted that the Company's internal controls were lacking,

especially in the area of providing reliable and realistic forecasts. In addition, the Company

announced that it was slashing second quarter 2005 guidance again, the second time in a month:

> Additionally, Symbol is revising previously announced Second Quarter 2005 revenue expectations to approximately $425 to $430 million from approximately $440 million. The Company also expects second quarter operating expenses to be lower than the previous guidance of $177 to $180 million, including the $7 million in expenses related to the legal defense of prior management.

> "While Symbol continues to undergo the implementation of new business processes across the organization, it is vital to have someone with Sal's operational and administrative expertise lead our efforts in these areas," said Nuti. "During the past three months, Sal has been instrumental in guiding the Company through a successful restructuring plan to reduce operating costs and has done so with the highest levels of efficiency and effectiveness. I'm excited to further benefit from Sal's superb talents, capabilities and business experience as he helps Symbol realize its true potential."

> *"Symbol has made major strides in improving our financial controls, but much work remains in areas such as forecasting," noted Iannuzzi. "I plan on intensely focusing my efforts on developing and implementing more effective forecasting processes."* [Emphasis added.]

65. On July 15, 2005, *Newsday* published an article titled "Symbol CFO quits as

forecast revised," which provided the following additional details:

Symbol Technologies Inc., acknowledging problems with accurately forecasting
financial results, yesterday said its chief financial officer resigned as it again
revised second-quarter expectations downward.

In a surprise release yesterday after the stock-market close, Symbol said Mark
Greenquist, who took over as CFO in 2003 as the company was embroiled in
federal probes of its accounting, was leaving "to pursue other career interests."

In a conference call yesterday, chief executive William Nuti emphasized that
Greenquist "is not being fired from the company." Nevertheless, Nuti said he
personally will take over forecasting duties at the company, with direct assistance
from Sal Iannuzzi, who takes over Greenquist's CFO role.

On the conference call, Iannuzzi, who is already Symbol's senior vice president
and chief administrative and control officer, acknowledged the problems with
forecasting financial results.

"Two weeks ago we gave guidance and now we have to revise it," he said.
"That's just not acceptable."

The problem, he said, stems from a number of "necessary" but "draconian"
measures and controls implemented after the discovery of widespread accounting
fraud at Symbol. "What we're seeing is that some of these procedures are
extremely difficult to deal with," Iannuzzi said. "It's one of the principal reasons
we're having such a difficult time giving you a forecast that works."

After having done so two weeks ago, Symbol yesterday revised second-quarter
revenue expectations downward, to a range of $425 million to $430million, from
a previous $440 million,

Responding to Wall Street concerns about rising expenses, Symbol said second-
quarter operating expenses would be lower than previous guidance, although legal
expenses tied to defending former executives and federal probes ballooned from a
previous $4.5 million to around $7 million.

66. On August 1, 2005, the Company issued a press release announcing its financial

results for the second quarter of 2005. The Company reported net revenue of $427.8 million and

a net loss of $30.5 million. Symbol's acting President and CEO, Iannuzzi, commented on the

results stating in pertinent part as follows:

"The results we are reporting today are in line with the expectations we

33

announced on July 14.... While we are pleased with our operating expense performance and encouraged by our year-over-year growth in product bookings, we remain focused on balancing our spending on activities needed to drive profitable growth. Increasing shareholder value is our top priority, and our confidence in Symbol's future growth prospects and position as a leader in the enterprise mobility segment remains strong."

67.     On the same day, the Company announced that Nuti had resigned his positions as President and CEO of the Company and would be leaving to become the CEO of NCR Corporation.

68.     On August 4, 2005, the Company filed its second quarter 2005 report with the SEC on a Form 10-Q. The Form 10-Q reiterated the results announced in the August 1, 2005 press release, and contained certifications signed by Ianuzzi, pursuant to Section 906 of the Sarbanes Oxley Act that were substantially similar to the certifications set forth in paragraph 36.

69.     The Director Defendants' statements referenced above were materially false and misleading in that they failed to disclose and misrepresented that: (a) Symbol's reported revenues were artificially inflated and reflected improperly recognized revenues; (b) Symbol's impressive reported results did not reflect the reality of its business, rather, such results reflected, in material part, improperly recognized revenues; (c) the Company did not maintain an adequate system of accounting and reporting controls; (d) the Company failed to adopt effective policies and procedures to promote good corporate governance; and (e) the Company's troubled past was not behind it because the Company's internal controls and processes were not altered sufficiently to guard against future accounting manipulation. Defendants' assurances to the contrary deceived the market and provided false comfort.

70.     As a result of the Director Defendants' actions, Symbol's market capitalization has been damaged by over $2.5 billion.

34

## ADDITIONAL CONFLICTS OF INTERESTS

71.     The long-standing personal and/or professional relationships among and between

defendants Yellin and Iannuzzi have created insurmountable conflicts of interest that have

caused and/or allowed them to exercise improper dominance and control over the Company and

caused Symbol to take the illegal and improper actions complained of herein. From 1982 to

2000 Defendant Iannuzzi held several senior positions at Bankers Trust Company, including

senior control officer and head of corporate compliance. Prior to 1999, Yellin served as

Executive Vice President and General Counsel for Bankers Trust Company. Because of their

long standing and entangling business and professional relationships, neither Yellin nor Iannuzzi

will take the action requested by plaintiff herein against one another or the remainder of the

Director Defendants.

## ILLEGAL INSIDER SELLING

72.     In disregard of their duties of trust and fidelity, during the relevant period, while

in the possession of materially adverse non-public information regarding Symbol, Symbol

insiders, including Nuti, either sold or acquiesced in and/or permitted the sale of significant

amounts of Company stock by the officers, directors and/or insiders of the Company.

Defendants were motivated to engage in the wrongdoing alleged herein because it allowed

Symbol insiders, to sell their shares at artificially inflated prices during the Relevant Period, as

follows:

| Name | Transaction Date | No. Shares Sold | Price/Share | Sales Proceeds |
|------|------------------|-----------------|-------------|----------------|
| William R. Nuti | 12/30/2004 | 400,000 | $ 16.45 | $ 6,580,000.00 |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right of and for the benefit of

Symbol to redress injuries suffered and to be suffered by Symbol as a direct result of the

35

violations of law, breaches of fiduciary duty, corporate mismanagement, abuse of control, as well as the aiding and abetting thereof, by the Director Defendants. Symbol is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

74.     Plaintiff will adequately and fairly represent the interests of Symbol and its shareholders in enforcing and prosecuting their rights.

75.     Plaintiff has not made any demand on the present Board of Directors of Symbol to institute this action since such demand would be a futile and useless act for the following reasons:

        a.     the entire Symbol Board of Directors participated in or approved many of the acts and omissions or were on notice of and/or recklessly disregarded the wrongs complained of herein;

        b.     The acts complained of herein constitute violations of law and breaches of the fiduciary duties owed by Symbol's Board of Directors and these acts are incapable of ratification;

        c.     The directors of Symbol cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the officers, employees or consultants responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is comprised of the same members that culpably allowed the wrongful conduct to occur on their watch dominated by defendants (such as William Nuti, who served as President and Chief Executive Officer during the Relevant Period) who were personally and directly involved in the misconduct alleged and/or who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will

continue to accede. This domination of the Board of Directors by certain defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept plaintiff's demands;

        d.     In order to bring this action for breaching their fiduciary duties, the members of the Symbol Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, which they would not do. Therefore, the Director Defendants would not be able to vigorously prosecute any such action;

        e.     During the Relevant Period, defendants Yellin, Samenuk, Chrenc and Kozel were members of the Company's Audit Committee. According to its Charter, the Audit Committee was entrusted with oversight responsibilities regarding the following: "(i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor." During the Relevant Period, however, the Audit Committee caused or allowed Symbol to: (i) revise its reports for the first three quarters of 2004 and for the fiscal years 2002 and 2003; (ii) revise financial projections for second quarter and fiscal 2005; and (iii) operate without adequate financial and internal controls to ensure complete and accurate financial reporting and reasonable, honest and meaningful financial projections. As a result of such misconduct, defendants Yellin, Samenuk, Chrenc and Kozel breached their duties owed to the Company, and therefore, any demand made upon them would be futile;

        f.     The members of the Symbol Board of Directors received payments, benefits, stock options and other benefits by virtue of their membership on the Board and their control of Symbol. They have thus benefited from the wrongdoing herein alleged and have

37

engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action; and

g.     If Symbol's current and past officers and directors are protected against personal liability for their acts of mismanagement, deception and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Corporation to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Symbol. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case likely contain provisions which eliminate coverage for any action brought directly by Symbol against these defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Symbol, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, the "insured versus insured exclusion" will not apply and will provide a basis for the Corporation to effectuate a recovery. If there is no directors' and officers' liability insurance at all then the defendant directors will not cause Symbol to sue them, since they will face a large uninsured liability.

## COUNT I

### Breach of Fiduciary Duties Against the Director Defendants

76.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

77.     The Director Defendants are fiduciaries of Symbol and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally,

38

faithfully, carefully, diligently and prudently. This cause of action is asserted based upon the Director Defendants' acts in violation of state law, which acts constitute breach of fiduciary duty.

78.     The Director Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them, and failed to exercise due care to prevent the violation of the federal securities laws and misuse of proprietary corporate information. The defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, that contrary to public statements, Symbol lacked an adequate system of internal controls thereby allowing Company insiders, including defendant Nuti, to profit by selling his personally-held shares of Symbol stock at artificially inflated prices during the Relevant Period without interference from the Director Defendants whose duties include preventing, detecting and remedying such conduct. The Director Defendants thereby breached their duty of care, loyalty, accountability and disclosure to the shareholders of the Company by failing to act as an ordinary prudent person would have acted in a like position.

79.     The defendants have been responsible for the gross mismanagement of Symbol. The defendants abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

80.     They caused Symbol to violate the federal securities laws;

81.     They caused Symbol to amend its quarterly reports filed with the SEC for the first, second and third quarters of 2004, and its annual report filed with the SEC for fiscal years 2002 and 2003;

82.     They concealed from the Company's shareholders and the investing public the fact that Symbol lacked adequate internal controls;

39

83.     They subjected Symbol to adverse publicity that could impair its earnings; and

84.     They misused or permitted the misuse of Symbol's internal proprietary corporate information in violation of federal and state laws and corporate rules and policies to the personal profit of certain corporate fiduciaries.

85.     As a result of defendants' wrongful conduct and wrongful action, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with the federal securities and other laws, Symbol has suffered considerable damage to and material diminution in value of its assets.

86.     All defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

87.     The Symbol Director Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

88.     By reason of the foregoing, the Director Defendants have breached their fiduciary obligations to Symbol and its shareholders.

89.     Symbol and its shareholders have been injured by reason of the defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of Symbol, seeks damages and other relief for the Company as hereinafter set forth.

### COUNT II

### Negligent Breach of Fiduciary Duties Against the Director Defendants

90.     Except to the extent they allege intentional or reckless misconduct by any defendant, plaintiff incorporates by reference the allegations in all of the preceding paragraphs.

40

91. The defendants engaged in the aforesaid conduct without exercising the reasonable and ordinary care owed to the Company by directors, officers, managing agents and employees of the Company.

92. Symbol and its shareholders have been injured by reason of the defendants' negligent breaches of their fiduciary duties. Plaintiff, as a shareholder and representative of Symbol, seeks damages and other relief for the Company as hereinafter set forth.

## COUNT III

### Against the Insider Selling Defendant Nuti for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

93. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94. At the time of the stock sales set forth herein, the Insider Selling Defendant Nuti knew the information described above, and sold Symbol common stock on the basis of such information.

95. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendant Nuti used for his own benefit when he sold Symbol common stock.

96. At the time of his stock sales, the Insider Selling Defendant Nuti knew that the Company's revenues were materially overstated. The Insider Selling Defendant's sales of Symbol common stock while in possession and control of this material adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.

97. Since the use of the Company's proprietary information for his own gain constitutes a breach of defendant Nuti's fiduciary duties, the Company is entitled to the

41

imposition of a constructive trust on any profits that Insider Selling Defendant Nuti obtained thereby.

## COUNT IV

### Against All Defendants for Abuse of Control

98.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.   The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Symbol, for which they are legally responsible.

100.   As a direct and proximate result of the Director Defendants' abuse of control, Symbol has sustained significant damages.

101.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

102.   Plaintiff on behalf of Symbol has no adequate remedy at law.

## COUNT V

### Against All Defendants for Gross Mismanagement

103.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.   By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Symbol in a manner consistent with the operations of a publicly held corporation.

105.   As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, Symbol has sustained significant damages in excess of hundreds of millions of dollars.

42

106. As a result of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

107. Plaintiff on behalf of Symbol has no adequate remedy at law.

## COUNT VI

## Against All Defendants for Waste of Corporate Assets

108. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Symbol to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

110. As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

111. Plaintiff on behalf of Symbol has no adequate remedy at law.

## COUNT VII

## Against All Defendants for Unjust Enrichment

112. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Symbol.

114. Plaintiff, as a shareholder and representative of Symbol, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

43

benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment on behalf of Symbol as follows:

(1) Determining that this action is a proper derivative action maintainable under law;

(2) Against each defendant for restitution and/or damages in favor of plaintiff, on behalf of Symbol and its public shareholders;

(3) Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Symbol has an effective remedy;

(4) Setting aside the election of each of the Director Defendants to the Symbol Board of Directors

(5) Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

(6) Granting such other and further relief as this Court may deem just and proper.

44

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on the issues so triable.

DATED: February 16, 2006

**MILBERG WEISS BERSHAD & SCHULMAN LLP**

By:_____

Steven G. Schulman (SS-2561)
Peter E. Seidman (PS-8769)
Sharon M. Lee (SL-5612)
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**LAW OFFICES OF
CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center – Baltimore
Suite 2525
401 E. Pratt Street
Baltimore, MD 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300

*Counsel for Plaintiff*

45

## VERIFICATION

I, Frank G. Rosenski, have reviewed the Symbol Technologies, Inc. Shareholder Derivative Complaint and am familiar with the contents thereof. Based upon my discussions and reliance upon my counsel, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9 day of January, 2006.

Frank G. Rosenski